IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THOMAS S. MANFRE,             ) | |
|                 Plaintiff,             ) | |
|                 v.             ) | |
| JEROME MAY, WILLIAM MAY, DAVID MAY, and R&M FREIGHT, INC.,             ) | Case No. 08 C 1281 |
|                 Defendants.             ) | Judge Matthew F. Kennelly |
| R&M FREIGHT, INC.,             ) | Magistrate Judge Michael T. Mason |
|                 Defendant/Counter-Plaintiff,             ) | |
|                 v.             ) | |
| THOMAS S. MANFRE,             ) | |
|                 Plaintiff/Counter-Defendant.             ) | |

**MEMORANDUM IN SUPPORT OF
<u>PLAINTIFF'S MOTION TO DISMISS DEFENDANT R&M'S COUNTERCLAIMS</u>**

Plaintiff Thomas Manfre is a twenty-five percent shareholder in Defendant/Counter-Plaintiff R&M Freight, Inc. ("R&M"). The remaining seventy-five percent of R&M is owned by three brothers, Defendants Jerome, William, and David May (collectively "the May Brothers"). After being frozen out of R&M by the May Brothers, Mr. Manfre brought this action for shareholder remedies, breach of fiduciary duty, and for inspection of corporate records against both the May Brothers and R&M. In response, R&M and its controlling shareholders, the May Brothers, though they admitted many of the key allegations of Mr. Manfre's Complaint, denied the effect of those allegations. At the same time, though, R&M asserted four counterclaims against Mr. Manfre, alleging that he breached fiduciary duties he owed to R&M, usurped R&M's

corporate opportunities, violated the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* ("ITSA") and, despite having previously denied the existence of it, breached an oral agreement not to compete. (Defendant/Counter-Plaintiff R&M Freight Inc.'s Answer, Affirmative Defenses and Counterclaims ("R&M Answer" or "R&M Counterclaims"), Dkt. 18.) Each of these, however, fails to actually state the claimed cause of action. Accordingly, the Court should dismiss R&M's counterclaims.

## FACTUAL BACKGROUND

### I. THE DISPUTE REGARDING R&M.

#### A. The Creation And Early Operations Of R&M.

In 2003, Mr. Manfre, the May Brothers, and their father, Robert May incorporated R&M and purchased the assets that would be used to operate R&M in its current form. (May Brothers' Answer and Affirmative Defenses ("Mays' Answer"), Dkt. 17, ¶ 13.)[1] After Robert May transferred his shares of R&M to his sons in late 2004, each of the May Brothers and Mr. Manfre owned 250 shares of the 1,000 outstanding shares in the corporation. (*Id.* ¶¶ 15, 20.)

For the next few years, the shareholders of R&M cooperated to operate a successful business. During this time, each of the May Brothers held management positions at R&M and served on its Board of Directors and its Executive Committee. (Mays' Ans. ¶¶ 16-17.) Though never an employee of R&M, until January 9, 2008, Mr. Manfre served as the Chairman of its Board of Directors and was a member of its Executive Committee. (*Id.* ¶¶ 2, 16; R&M Countercl. ¶ 4.)

---

[1] R&M has explicitly adopted the May brothers' responses to Paragraphs 1 through 63 of Manfre's Complaint. (*See* R&M Ans., at 1-2.) Accordingly, Plaintiff cites directly to the May Brothers' Answer where appropriate.

In late 2005, R&M began working with an investment banker on the possibility of selling the company.  (Mays' Ans. ¶ 22.)  In connection with this, the May Brothers and Mr. Manfre agreed that they were not interested in selling the company for less than $20 million in cash and agreed not to pursue a sale if it would not net each shareholder at least $5 million.  (*Id.* ¶ 22.)  The shareholders arrived at this figure because they believed it would fairly compensate them for their contributions to R&M and allow them to retire from the industry.  (*Id.*)

### B.   The May Brothers First Propose That They Be Paid Bonuses.

In November 2006, at a meeting of the R&M Executive Committee, the May Brothers proposed that the company, for the first time, pay bonuses to the May Brothers—of $225,000 each. (Mays' Ans. ¶¶ 24-25.)  At the same time, Jerome May's proposed that each shareholder, meaning the May Brothers plus Mr. Manfre, receive a $75,000 dividend.  (*Id.*)  In response, Mr. Manfre wrote Jerome May, seeking information about the reasons for the proposal and suggesting alternate ways of proceeding.  (*Id.* ¶¶ 26-27.)

Following Mr. Manfre's request, the R&M Executive Committee held a special meeting to discuss Jerome May's proposal as well as two put forward by Mr. Manfre.  (Mays' Ans. ¶ 29.)  At that meeting, the Executive Committee voted four to one to adopt Jerome May's proposal, with Mr. Manfre casting the only vote against it.  (*Id.*)  As a result, R&M paid each of the May Brothers a $225,000 bonus and each shareholder only a $75,000 dividend.  (*Id.* ¶ 30.)

### C.   The May Brothers Again Propose That They Be Paid Bonuses.

The bonus issue arose again in November 2007.  In a November 26, 2007 email, David May unilaterally cancelled the November and December meetings of the R&M Board.  (Mays' Ans. ¶ 33.)  He then proposed in that same email that the May Brothers each once again be given a $225,000 bonus.  (*Id.* ¶ 34.)  On November 29, 2007, both Jerome and William May emailed to vote in favor of the proposal.  (*Id.* ¶ 35.)  The next day, Mr. Manfre responded by expressing

disagreement both with awarding bonuses when R&M had missed its budget and with the form in which the proposal had been made. (*Id.* ¶¶ 36-37.) As he had done the prior year, Mr. Manfre also made an alternate proposal that would have resulted in the same amount of money being distributed to the May Brothers and him while also avoided negative tax consequences for R&M. (*Id.* ¶ 38.) On December 7, 2007, David May informed the R&M Board of Directors by email that the bonus proposal had passed by a vote of three to one.[2] (*Id.* ¶ 39.)

### D. Mr. Manfre Seeks An Amicable Buyout Of His Shares.

Following this second dispute regarding bonuses, on December 11, 2007, Mr. Manfre wrote to Jerome May to explain his position regarding the recent actions by the R&M Board. (Mays' Ans. ¶ 41.) In that letter, Mr. Manfre proposed to the May Brothers that if they wanted to continue to do as they pleased with R&M, they should buy out his shares at fair value. (*Id.*) Several days later, on December 17, 2007, Jerome May wrote to Mr. Manfre, indicating that the R&M Board wished to begin a dialogue to establish the price for Mr. Manfre's shares and to find a way for R&M to pay that price. (*Id.* ¶ 43.) Mr. Manfre wrote to Jerome May on December 19, 2007 to agree with his suggestion that R&M's accountant aid the shareholders in establishing the price for Mr. Manfre's shares. (*Id.* ¶ 46.)

### E. The May Brothers Freeze Mr. Manfre Out Of R&M.

At the same time he sent that letter, Jerome May also issued a notice scheduling a special meeting of the R&M Board for December 26, 2007, but neglected to provide an agenda for the meeting. (Mays' Ans. ¶ 44.) That same day, Mr. Manfre indicated he might not be able to

---

[2] In 2007, Robert May resigned his positions as President, CEO, and Director of R&M, (Mays' Ans. ¶ 31), leaving both the Board and the Executive Committee with four members.

attend the meeting and pointed out that the notice failed to identify the issue to be discussed at the special meeting. (*Id.* ¶ 45.)

On the morning of the special meeting, Mr. Manfre again inquired as to the issues to be discussed during the special meeting and requesting the agenda. (Mays' Ans. ¶ 47.) In response, Jerome May informed Mr. Manfre that the meeting was to discuss Mr. Manfre's buy-out demand and make any necessary motions that might follow. (*Id.* ¶ 48.) The meeting occurred later that day, without Mr. Manfre attending. (*Id.* ¶ 49.)

On December 28, 2007, Jerome May, as president of R&M, issued two notices of R&M shareholder meetings. (Mays' Ans. ¶ 50.) The first called a special meeting of the shareholders for January 8, 2008 to consider amendments to the R&M Article of Incorporation to (1) increase the number of authorized shares from 100,000 to 5 million and (2) eliminate cumulative voting of shares. (*Id.*) The second notice set the annual shareholder meeting for the day after the special meeting, January 9, 2008. (*Id.* ¶ 51.) In response, Mr. Manfre informed Jerome May that he could not attend the meetings and requested proxy materials to vote his shares. (*Id.* ¶ 52.) On January 8, 2008, the May Brothers voted in favor of eliminating cumulative voting and increasing the authorized number of shares from 100,000 to 5,000,000. (*Id.* ¶ 54.)

On January 9, 2008, Jerome May responded to a January 7, 2008 email from Mr. Manfre inquiring about the status of establishing a price for Mr. Manfre's shares. (Mays' Ans. ¶ 55.) Though Mr. Manfre had agreed to the proposal to have R&M's accountant help establish a price nearly a month earlier, Jerome May stated that the May Brothers were previously unaware of that agreement, but would start working with the accountant after Jerome May returned from vacation. (*Id.*) Also in the same email, Jerome May informed Mr. Manfre that because of Mr. Manfre's buyout request, the R&M shareholders had changed the Executive Committee to now consist of only the May Brothers. (*Id.* ¶ 56.) Finally, Jerome May informed Mr. Manfre that he

had not been re-elected to the R&M Board of Directors. (*Id.*) As a result of these actions, Mr.Manfre had been removed from all positions with the company, leaving only the May Brothers as officers or directors. (*Id.*)

Based on the foregoing conduct, Mr. Manfre initiated this action, bringing claims against both R&M and the May Brothers for shareholder oppression, breaches of fiduciary duty, and failure to allow for the examination of R&M's corporate records.

## II.    R&M BRINGS ITS OWN CLAIMS AGAINST MR. MANFRE.

In addition to answering, R&M brought counterclaims against Mr. Manfre. In support of those claims, R&M alleges that Mr. Manfre is the owner of Specials Transportation, Inc. ("Specials"), a company that R&M claims serves the same market as R&M and has received referrals of overflow business from R&M. (R&M Countercl. ¶ 5.) Despite having denied the existence of an oral contract when Mr. Manfre alleged its existence, (Mays' Ans. ¶ 61), R&M alleges that the referrals R&M made to Specials were made pursuant to an oral agreement made for R&M's benefit and with the explicit understanding that any business opportunities over and above those referred to Specials were R&M's. (R&M Countercl. ¶ 5.)

Additionally, on information and belief, R&M alleges that, Mr. Manfre, as an owner and director of Specials, has been soliciting and serving clients in the same market as that served by R&M and that Specials has begun providing services other than the emergency pick-up and delivery services it has traditionally offered. (R&M Countercl. ¶ 7.) R&M further alleges Mr. Manfre has used its corporate information to direct and manage Specials in ways that directly compete with R&M, including to solicit R&M customers. (*Id.* ¶¶ 10-14.) It does not allege that any of those solicitations have succeeded, and therefore does not allege that it has lost any business to Specials as a result of Mr. Manfre's alleged solicitations.

Based on these allegations, R&M attempts to state claims against Mr. Manfre—and not against Specials—for breach of fiduciary duty, usurpation of corporate opportunity, violations of ITSA, and breach of contract. (R&M Countercl. ¶¶ 17-44.)

## ARGUMENT

### I. THE COURT SHOULD DISMISS COUNTS I AND II BECAUSE R&M DOES NOT ALLEGE THE REQUIRED ELEMENTS OF ITS FIDUCIARY DUTY CLAIMS.

R&M's first counterclaim purports to assert a claim against Mr. Manfre for breach of fiduciary duty while its second attempts to state a claim for usurpation of corporate opportunities. (*See* R&M Countercl. ¶¶ 17-32.) Both claims require that R&M allege that Mr. Manfre owed it a fiduciary duty, that he breached that duty, and that damages resulted from that breach. R&M's allegations fail to establish either that Mr. Manfre owed R&M the required duty or that R&M suffered any damages as result of any alleged breach of such a duty. Indeed, R&M's answer makes clear that Mr. Manfre could owe R&M no fiduciary duties because the May Brothers' own actions as controlling shareholders deprived him of the ability to influence or control the corporation in any means whatsoever. Similarly, Counts I and II of R&M's Counterclaims fail to allege any damages that might have resulted from any alleged breach. Accordingly, the Court should dismiss R&M's first and second counterclaims.

### A. As A Minority Shareholder Who Could Not Hinder, Influence, Or Control R&M, Mr. Manfre Owed No Fiduciary Duty To R&M.

R&M's first two counterclaims—breach of fiduciary duty and usurpation of corporate opportunity—require that Mr. Manfre owe R&M a fiduciary duty. *Polansky v. Anderson*, No. 04 C 3526, 2005 WL 3557858, at *8 (N.D. Ill. Dec. 29, 2005) (elements of breach of fiduciary duty claim); *Sain v. Nagel*, 997 F. Supp. 1002, 1016 (N.D. Ill. 1998) (corporate usurpation doctrine). In Illinois, however, it is well-settled that "something more than mere status as a shareholder in a

close corporation is required to impose a fiduciary duty." *Dowell v. Bitner*, 652 N.E.2d 1372, 1379 (Ill. App. Ct. 1995); *see also Hagshenas v. Gaylord*, 557 N.E.2d 316, 321 (Ill. App. Ct. 1990) ("[A] mere owner of stock in a company does not owe a fiduciary duty to that company."), *appeal denied*, 561 N.E.2d 691 (Ill. 1990); *Voss Eng'g, Inc. v. Voss Indus., Inc.*, 481 N.E.2d 63, 67 (Ill. App. Ct. 1985) (same). Rather, to owe a fiduciary duty, a shareholder must at a minimum have the ability to "hinder, influence, or control the corporation." *Dowell*, 652 N.E.2d at 1379; *see also Monfardini v. Quinlan*, No. 02 C 4284, 2004 WL 533132, at *5 (N.D. Ill. Mar. 24, 2002) (same).

Here, R&M's own admissions and allegations demonstrate that it cannot establish that Mr. Manfre had the required duty. R&M first admits that its articles of incorporation were amended to (1) increase the authorized number of shares from 100,000—of which 1,000 had been issued—to 5,000,000; and (2) eliminate cumulative voting. (Mays' Ans. ¶ 54.) By vastly increasing the authorized number of shares, the Defendants threatened to make Mr. Manfre's 250 share stake in R&M a miniscule percentage of the total number of shares in R&M. More importantly, with the elimination of cumulative voting, the May Brothers were able to remove Mr. Manfre from his positions at the company and to divest him of all of his authority. Indeed, R&M admits that on January 9, 2008, Jerome May informed Mr. Manfre that the May brothers had removed him from R&M's Executive Committee, and that by that same date, Mr. Manfre ceased to serve as a director and Chairman of the Board of Directors by January 9, 2008— leaving *only* the May Brothers as officers or directors of the company. (*Id.* ¶¶ 2, 56.) As a result, R&M's Counterclaims (through its incorporation of the Mays' Answer) establish that Mr. Manfre had no ability to hinder, influence, or control R&M after January 9, 2008.

Despite this, the only facts that R&M identifies in support of its claims for breach of fiduciary duty and usurpation of corporate opportunity are events that occurred *after* January 9,

2008.  In paragraphs 11 through 13 of its counterclaims, R&M makes allegations regarding Specials' solicitation of customers that R&M now claims for itself.  (R&M Countercl. ¶¶ 11-13.)  As R&M itself alleges, however, these solicitations occurred on January 24, 2008 and March 4, 2008—after Mr. Manfre had been frozen out of R&M by the May Brothers, and therefore no longer owed it any fiduciary duties.  Accordingly, these alleged acts cannot be the basis for R&M's first and second counterclaims.  And because they are the *specific* acts alleged as the basis for that claim, that claim should now be dismissed.

Further, though, R&M's Counterclaims also demonstrate that Mr. Manfre lacked the ability to hinder, influence, or control the corporation long before that date as well.  Indeed, those facts show that for two years, Mr. Manfre objected to proposals from the May Brothers to pay them substantial bonuses, but was outvoted in each instance.  (Mays' Ans. ¶¶ 29-30, 34-39.)  Those same admissions show that Mr. Manfre so lacked influence or control over R&M that he could not even get the May Brothers to discuss with him the idea of buying out his shares in the company.  (*Id.* ¶¶ 41, 43, 46, 55.)

Thus, the facts that R&M judicially admits and the shortcomings of its own allegations combine to show that Mr. Manfre owes R&M no fiduciary duty as a matter of law.  Because such a duty is a required element of both R&M's first and second counterclaims, those claims should be dismissed, with prejudice.

  **B. Even If It Can Establish That Mr. Manfre Owed R&M A Fiduciary Duty, R&M Fails To Allege Any Facts Demonstrating That It Was In Any Way Damaged By Mr. Manfre's Supposed Breach Of That Duty.**

R&M's first and second counterclaims attempt to state claims and recover damages based on Specials supposedly taking business opportunities from R&M.  Therefore, to state a claim, R&M must allege that it suffered an injury as a result of Mr. Manfre's supposed breach of fiduciary duty.  *Polansky*, 2005 WL 3557858, at *8.  Similarly, to state its claim for usurpation

of corporate opportunities, R&M must allege that Specials actually acquired R&M's corporate opportunities. *Sain*, 997 F. Supp. at 1016. On both scores, however, R&M completely fails. Indeed, R&M's Counterclaims fail to allege that Specials actually succeeded in any of its supposed efforts to lure customers away from R&M. R&M's failure to allege that Specials succeeded in taking business away from it means that R&M has not sufficiently alleged the damages element of either of its first two counterclaims. Accordingly, both of those claims should be dismissed. *Polansky*, 2005 WL 3557858, at *8 (dismissing breach of fiduciary duty claim where the facts pled render the plaintiff's conclusory allegation of breach of a fiduciary duty "suspect and deficient"); *Sain*, 997 F. Supp. at 1016-17 (failure to prove damages dooms plaintiffs' corporate usurpation claim).

## II. R&M'S CLAIM FOR USURPATION OF CORPORATE OPPORTUNITY IS BARRED BY THE ITSA.

Regardless of whether it survives R&M's failure to allege the required elements of the claim, R&M's second counterclaim should nonetheless be dismissed because it is preempted by the ITSA. The ITSA "is the exclusive remedy under Illinois law for misappropriation of trade secrets." *AutoMed Techs., Inc. v. Eller*, 160 F. Supp. 2d 915, 921 (N.D. Ill. 2001) (citing 765 ILCS 1065/8(a)). Indeed, as the Seventh Circuit has noted, "Illinois has abolished all common law theories" based on the misuse of trade secrets. *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265 (7th Cir. 1992); *see also Learning Curve Toys, L.P. v. PlayWood Toys, Inc.*, No. 94 C 6884, 1999 WL 529572, at *3 (N.D. Ill. July 20, 1999) ("In sum, the ITSA does not . . . simply preempt common law claims for which misappropriation of a trade secret is an element. Rather, the provision eliminated common law claims based on conduct which might support an ITSA action."). Where a claim alleges a breach of a duty of loyalty and that breach is alleged to have occurred as a result of the use of confidential information, the

allegation is one for the misappropriation of a trade secret. *AutoMed Techs.*, 160 F. Supp. 2d at 922 ("Breaching a duty of loyalty by using confidential information is still misappropriation of a trade secret.")

Here, R&M alleges that Mr. Manfre "has been using R&M's corporate information . . . to direct and manage Specials in ways that directly compete with R&M." (R&M Countercl. ¶ 10.) R&M also alleges, though, that its corporate information "is of significant monetary value and is neither known to the general public nor R&M's competitors, nor is it readily obtainable" and that it "takes reasonable measures to maintain the secrecy of the aforementioned information." (*Id.* ¶¶ 8-9.)[3] Finally, R&M alleges that Mr. Manfre used his knowledge of that corporate information to direct Specials' marketing efforts. (*Id.* ¶ 29.) Because R&M's own allegations make clear that the usurpation for which it attempts to recover involved the use of R&M's supposed trade secrets, that claim cannot stand as a common law claim and instead must be brought as a statutory claim under ITSA. For this reason alone, R&M's second counterclaim should be dismissed.

### III. R&M CANNOT STATE A CLAIM UNDER THE ILLINOIS TRADE SECRETS ACT BECAUSE THE INFORMATION IT ALLEGES TO BE SECRET IS POSTED ON R&M'S WEBSITE.

In its third counterclaim, R&M unsuccessfully attempts to state a claim for violations of the ITSA. Such a claim requires R&M to allege (1) that its trade secrets, meaning information not generally known in the industry, were (2) misappropriated and (3) used by Mr. Manfre in his

---

[3] As discussed below, these allegations are contradicted by R&M's own website. That fact, though, does change the outcome. Even if its allegations that its corporate information constitutes a trade secret fail— as they do because R&M puts that information on its own website—R&M cannot claim in the alternative that the use of that information can still be the basis for a usurpation claim. As the Seventh Circuit has held, the Illinois Trade Secrets Act "abolished" common law theories of misuse of trade secrets, meaning the only way that a party can be held liable for the use of confidential information is if that information is a statutory trade secret. *Composite Marine*, 962 F.2d at 1265 ("Unless defendants misappropriate a (statutory) trade secret, they did no legal wrong."); *see also Learning Curve*, 1999 WL 529572, at *3.

business.  *Composite Marine*, 962 F.2d at 1265-66.  R&M, however, has not adequately pled either the first or third of these elements, meaning its third counterclaim should be dismissed.

First, R&M has not identified the require trade secret.  To allege the existence of a trade secret, R&M "must show concrete secrets," meaning "[i]t is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated." *Composite Marine*, 962 F.2d at 1265-66.  Notwithstanding this requirement, R&M alleges that nearly all aspects of its business constitute trade secrets:  "R&M's corporate information, including but not limited to its finances, customers lists, executive committee proceedings and discount programs, constitute trade secrets."  (R&M Countercl. ¶ 34.)  Because all it has done is point to a broad area, namely its entire business, R&M has failed to sufficiently allege the existence of an actual trade secret.  *See Composite Marine*, 962 F.2d at 1265-66.

Moreover, even if this broad listing could be excused by the fact that it includes R&M's "discount programs," R&M's own allegations show that its pricing could not be a trade secret.  This is because R&M does not keep its pricing programs secret.  Indeed, in describing the only specifically identified supposed misappropriation, R&M alleges that the rates offered were "set lower than those of R&M in order to undercut R&M's published rates and confidential discount programs."  (R&M Countercl. ¶ 12; *see also id.* ¶ 35 ("Manfre has in fact misappropriated R&M's trade secrets by using his knowledge of R&M's discount programs . . . .").)  Thus, R&M's claim is based solely on the alleged use of pricing information.  In basing its claim on this, though, R&M ignores that its pricing information, including fuel surcharges, is published on its website.  (*See* Exhibit A, attaching relevant portions of the R&M website.)[4]  Because the

---

[4] R&M's counterclaims allege that it publishes its rates.  (R&M Countercl. ¶¶ 12-13.)  The R&M website is one such place where those rates are published, meaning the Court can and should consider the content of that website in evaluating R&M's allegations.  *Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1248
Continued on following page

publication of that information on R&M's website means its pricing information is not a trade secret, the Court should dismiss R&M's third counterclaim.

Second, R&M has not alleged that Mr. Manfre is using anything misappropriated from R&M in his business. Rather, all that R&M alleges is that Specials is making solicitations of customers that it previously served and in those solicitations offering prices that are lower than R&M's rates. (R&M Countercl. ¶ 12.) This allegation fails in two ways to satisfy the requirement that R&M allege that Mr. Manfre be using the supposedly misappropriated information. First, it fails to allege how Mr. Manfre, as opposed to Specials, is using the information in any way. Second, and more significantly, it fails to allege that a trade secret is being used, as opposed to the information R&M itself makes publicly available by putting its pricing information on its website. These additional failings of its allegations further demonstrate that R&M's third counterclaim should be dismissed.

IV. **R&M CANNOT STATE A BREACH OF CONTRACT CLAIM AGAINST MR. MANFRE FOR A CONTRACT BETWEEN R&M AND SPECIALS, LET ALONE RECOVER PUNITIVE DAMAGES FROM HIM FOR THAT SUPPOSED BREACH.**

In its fourth counterclaim, R&M attempts to state a claim against Mr. Manfre for breach of contract. In its allegations, however, R&M fails to identify any contract to which Mr. Manfre is a party. Instead, all that R&M alleges is that "R&M and Specials, through Manfre, its sole owner and director, had an agreement." (R&M Countercl. ¶ 40.)[5] Thus, R&M's own allegations

---

Continued from previous page
(7th Cir. 1994) (documents referred to in a plaintiff's complaint and attached to a motion to dismiss are considered part of the pleadings and so may be considered in ruling on the motion to dismiss).

[5] The entirety of Count IV is also wholly inconsistent with R&M's answer. R&M incorporates paragraphs 1 through 63 of the May Brothers' answer as its own. (R&M Ans., at 1-2.) In paragraph 61 of its answer, therefore, R&M states that it is "without knowledge or information sufficient to form a belief as to the allegations of paragraph 61 concerning a pre-existing agreement between R&M and Specials not to compete." (R&M Ans. ¶ 64; Mays' Ans. ¶ 61.)

demonstrate that its claim is not based on a contract to which Mr. Manfre is a party. Yet, being party to the contract that is alleged to have been breached is the most basic requirement of a claim for breach of contract. *See, e.g.*, *Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 587 (7th Cir. 2001) (listing elements of breach of contract claim, including that the *defendant* breached the contract); *Tin Cup Pass Ltd. P'ship v. Daniels*, 553 N.E.2d 82, 84-85 (Ill. App. Ct. 1990) (dismissing breach of contract claim against promoters because they were not party to a contract that was intended to be with the corporation that they were promoting). Because R&M cannot satisfy this most basic requirement, the Court should dismiss its fourth counterclaim.

## V.  R&M FAILED TO ALLEGE ANY FACTS JUSTIFYING ITS REQUESTS FOR PUNITIVE DAMAGES.

Even if, despite their numerous deficiencies, R&M's counterclaims somehow survive, its request for punitive damages in its first, second, and fourth counterclaims should still be stricken. First, to support its requests for punitive damages in its first and second counterclaims, R&M inserts the conclusory allegation that Mr. Manfre acted with "actual malice and in bad faith, and was wanton and willful." (R&M Countcl. ¶¶ 23, 31). However, it is well established that "[o]ne cannot, of course, create a claim for punitive damages where none exists by merely inserting a conclusory allegation of willful and wanton conduct into a set of facts which would not support a finding of such conduct as a matter of law." *Bastian v. TPI Corp.*, 663 F. Supp. 474, 476 (N.D. Ill. 1987). Because R&M's allegations attempt to do just that, R&M's request for punitive damages in its first and second counterclaims should be stricken.

Second, R&M's request for punitive damages in its fourth counterclaim fails for two reasons. Principally, this request must fail because it is well established that, under Illinois law, a claim for breach of contract cannot support a request for punitive damages. *3Com Corp. v. Electronics Recovery Specialists, Inc.*, 104 F. Supp. 2d 932, 942 (N.D. Ill. 2000) ("a plaintiff

generally cannot recover punitive damages on a breach of contract claim"); *see also Morrow v. L.A. Goldschmidt Assocs., Inc.*, 492 N.E.2d 181, 185-86 (Ill. 1986) ("It is hornbook law that punitive damages do not lie for a breach of contract claim, regardless of whether the breach is willful."). Even if this were not the case, though, R&M's request still fails because R&M did not even bother to include its conclusory allegation regarding Mr. Manfre's behavior in its fourth counterclaim. Based on these failings, the request for punitive damages in R&M's fourth counterclaim must also be stricken.

## CONCLUSION

For the foregoing reasons, the Court should dismiss all of Defendant/Counterplaintiff R&M Freight, Inc.'s counterclaims and strike its claims for punitive damages.

Dated: May 2, 2008                                                    Respectfully submitted,

                                                                                                THOMAS S. MANFRE

                                                                                                 By:   s/ Max A. Stein
                                                                                                     One of His Attorneys

Matthew J. O'Hara (Atty. No. 6237795)
Max A. Stein (Atty. No. 6275993)
REED SMITH LLP
10 S. Wacker Drive
Chicago, IL  60606
(312) 207-1000

2177475.2

**CERTIFICATE OF SERVICE**

I, Max A. Stein, state that on May 2, 2008, I electronically filed the foregoing **MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO DISMISS DEFENDANT R&M'S COUNTERCLAIMS** with the Clerk of the Court using the ECF system which will send notification to all parties.

                                                  s/ Max A. Stein
                                          Max A. Stein (Atty. No. 6275993)
                                          REED SMITH LLP
                                          10 S. Wacker Drive
                                          Chicago, IL  60606
                                          (312) 207-1000